## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| HARTFORD FIRE INSURANCE CO., | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | **CIVIL ACTION** |
| v. | ) | |
| | ) | **No. 10-2637-KHV** |
| VITA CRAFT CORPORATION, | ) | |
| | ) | |
| Defendant/Counterclaim Plaintiff. | ) | |
| ———————————————————— | ) | |

## MEMORANDUM AND ORDER

Hartford Fire Insurance seeks a declaratory judgment that it had no duty to defend or to indemnify its insured, Vita Craft Corporation, for claims which Thermal Solutions, Inc. asserted against Vita Craft in underlying litigation. Vita Craft brings counterclaims for declaratory judgment, breach of contract and breach of the duty of good faith and fair dealing. This matter is before the Court on Vita Craft Corporation's Motion For Summary Judgment (Doc. #51) and [Hartford's] Motion For Summary Judgment (Doc. #53), both filed May 18, 2012. For reasons set forth below, the Court finds that Vita Craft's motion should be sustained in part and that Hartford's motion must be overruled.

## Summary Judgment Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. See Fed. R. Civ. P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986); Vitkus v. Beatrice Co., 11 F.3d 1535, 1538-39 (10th Cir. 1993). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." Liberty Lobby, 477 U.S. at 248. A "genuine" factual dispute requires

more than a mere scintilla of evidence.  Id. at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Hicks v. City of Watonga, 942 F.2d 737, 743 (10th Cir. 1991).  Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."  Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); Bacchus Indus., Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on its pleadings but must set forth specific facts.  Applied Genetics, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing a motion for summary judgment.  Deepwater Invs., Ltd. v. Jackson Hole Ski Corp., 938 F.2d 1105, 1110 (10th Cir. 1991).  It may grant summary judgment if the nonmoving party's evidence is merely colorable or is not significantly probative.  Liberty Lobby, 477 U.S. at 250-51.  "In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial."  Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  Liberty Lobby, 477 U.S. at 251-52.

## Factual Background

The following facts are uncontroverted or deemed admitted.  Where disputed, each party's factual contention is stated.

I.       **Underlying Lawsuit**

Thermal Solutions, Inc. ("TSI") innovates and patents new products, then contracts with others to manufacture its patented products, or licenses to others the right to do so. TSI licensed to Imura International U.S.A., Inc. ("II-USA") the exclusive right to distribute and sell certain cookware that incorporated Radio Frequency Identification ("RFID") technology. Vita Craft is a wholly-owned subsidiary of II-USA. Mamoru Imura is CEO and president of Vita Craft.

On May 9, 2008, TSI filed suit against II-USA, Vita Craft and Imura. See Thermal Solutions, Inc. v. Imura Int'l U.S.A, Inc., Vita Craft Corp. & Mamoru Imura, Case No. 08-cv-2220-JWL (the "underlying lawsuit" or the "TSI lawsuit"). On July 11, 2008, TSI filed a first amended complaint (the "underlying complaint") which asserted seven counts.[1]

------

[1]         The underlying complaint alleged in relevant part as follows:

TSI is a leading inventor of products utilizing magnetic induction heating and RFID technology. [In 2003 and 2004] TSI entered into two License Agreements with Imura International that gave Imura International the right to use several of TSI's patents and related RFID technology in conjunction with the distribution and sale of Cookware and Charging Units for household use.

During the term of the License Agreements, Imura International and Vita Craft "engaged in conduct that constituted a wholesale disregard for TSI's intellectual property rights and the rights granted in the License Agreements." Mamoru Imura obtained or sought to obtain patent rights in TSI's trade secrets and other Confidential Information without TSI's authorization or consent.

On April 29, 2004, Mamoru Imura filed U.S. Patent Application No. 10/833,356, entitled Radio Frequency Identification Controlled Heatable Objects. This application disclosed Confidential Information that far exceeded the limited approval TSI gave him to disclose such information and claimed inventions that Mamoru Imura did not invent.

Mamoru Imura assigned U.S. Patent Application No. 10/833,356 to Imura International on May 10, 2004. The application issued as U.S. Patent No. 7,157,675

(continued...)

Count I sought a declaration that Imura's patent on "radio frequency identification controlled heatable objects," U.S. Patent No. 7,157,675, is invalid.  Counts II, III and VII alleged breach of contract.[2]  Count IV alleged that Vita Craft and Imura infringed TSI patents by manufacturing and

---

[1](...continued)
(hereafter the "'675 Patent") on January 2, 2007.

Mamoru Imura also filed U.S. Patent Application No. 11/148,802, U.S. Patent Application No. 11/266,148, U.S. Patent Application No. 11/266,104, U.S. Patent Application No. 11/561,415, and U.S. Patent Application No. 11/617,407.  These applications disclosed Confidential Information that far exceeded the limited approval TSI gave Mamoru Imura to disclose such information and claimed inventions that Mamoru Imura did not invent.

The issuance of the '675 Patent and potential issuance of patents on the other applications prevent TSI from practicing its patents and using its related RFID technology.  Imura International and Vita Craft, through the conduct of their officer, Mamoru Imura, threatened TSI's licensees and other third parties with which TSI had a business relationship, in turn disrupting and/or severing some of those relationships.

Imura International and Vita Craft, through the conduct of their officer Mamoru Imura, also engaged in and orchestrated a scheme to damage and injure TSI by spreading false rumors regarding one of TSI's licensees.  [Paragraph 22].

By letters dated January 7, 2006. TSI notified Imura International and Vita Craft that it considered them to be in breach of the License Agreements and had 30 days to remedy their breaches.

Because Imura International and Vita Craft failed to remedy their breaches within the 30-day cure period, by email dated February 9, 2006, TSI notified them that the License Agreements were terminated.

Doc. #28 in Case No. 08-2220.  The underlying complaint sought declaratory relief, an injunction, specific performance of the License Agreements, compensatory damages and disgorgement of profits in excess of $75,000, punitive damages, exemplary damages and attorneys' fees.

[2]      Count II alleged that II-USA and Vita Craft breached the License Agreements between TSI and II-USA by entering unauthorized contracts with third parties, disclosing confidential information of TSI, attempting to transfer TSI patents and technology to third parties
(continued...)

-4-

selling TSI technology without authorization.  Count V alleged misappropriation of trade secrets.[3]

Count VI alleged a common law claim for unfair competition.  The underlying complaint did not

contain separate counts which sought recovery for libel, slander or disparagement of goods, products

and/or services.  Each count, however, incorporated the allegations that Vita Craft and Imura

engaged in a scheme to damage and injure TSI by spreading false rumors regarding one of TSI's

licensees.

On August 20, 2010, the Honorable John W. Lungstrum granted summary judgment to all

defendants on TSI's claims for unfair competition, misappropriation of trade secrets and breach of

contract.[4]  As a result, only two TSI claims remained in the underlying lawsuit: Count I, which

sought a declaration that Imura's U.S. Patent No. 7,157,675 was invalid and Count IV, which alleged

infringement of TSI's patent.  On March 9, 2012, Judge Lungstrum granted defendants summary

judgment on those claims.  On March 19, 2012, Judge Lungstrum realigned the parties for purposes

of trial on defendants' counter-claim, in which II-USA and Vita Craft alleged that three TSI patents

----

[2](...continued)
and failing to pay royalties to TSI.
    Count III alleged that after TSI terminated the License Agreements, II-USA and Vita Craft
continued to disclose and use TSI patents, RFID technology and other confidential information
without TSI consent.  Count III alleged that such conduct unjustly enriched defendants and caused
TSI irreparable injury and damage.
    Count VII alleged that Imura breached his agreement to compensate TSI in the event that
Panasonic disclosed TSI's boiling detection algorithm to unauthorized third parties.

[3]         Specifically, Count V alleged that despite the License Agreements' requirement that
trade secrets be kept confidential, defendants disclosed 15 trade secrets.

[4]         Judge Lungstrum found that TSI could not prove its unfair competition and
misappropriation claims because TSI had not submitted evidence which linked its alleged damages
to conduct by defendants after the termination of the License Agreements.  Judge Lungstrum further
held that TSI could not prove its breach of contract claims because it had failed to submit evidence
which linked its alleged damages to any post-termination breach of contract and the alleged lost
profits were impermissibly speculative.

-5-

were unenforcable because of inequitable conduct before the United States Patent and Trademark Office.  After a bench trial, Judge Lungstrum granted judgment to TSI on that counterclaim.  See Memorandum And Order (Doc. #434) filed April 24, 2012 in Case No. 08-cv-2220-JWL.

On July 20, 2012, Judge Lungstrum granted TSI leave to assert a claim against II-USA and Vita Craft for specific performance of one provision of two contracts between the parties.  The parties tried that claim to Judge Lungstrum on September 11 and 12, 2012.  On September 28, 2012, Judge Lungstrum awarded TSI judgment on the claim for specific performance and ordered II-USA and Vita Craft to return specific confidential information to TSI on or before October 26, 2012.

## II.   The Insurance Policies

Effective December 31, 2003 through December 31, 2007, Hartford issued successive general liability policies to Vita Craft as named insured and Imura as CEO and president of Vita Craft (collectively, "the policies").  See Pretrial Order (Doc. #45) filed April 24, 2012 ¶ 4; Memorandum In Support Of Vita Craft Corporation's Motion For Summary Judgment (Doc. #52) filed May 16, 2012 (Vita Craft's Memorandum), Ex. A.  Effective December 31, 2003 through December 31, 2007, Hartford also issued umbrella policies to Vita Craft and Imura as CEO and president of Vita Craft, (collectively, "the umbrella policies").  See Pretrial Order (Doc. #45), ¶ 4; Vita Craft's Memorandum (Doc. #52), Ex. B.

The policies required Hartford to defend and indemnify third-party claims for "personal and advertising injury" against Vita Craft as follows:

> [Hartford] will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies. [Hartford] will have the right and duty to defend the insured against any "suit" seeking those

damages. . . ."[5]

Doc. #52, Ex. A.  The policies define "personal and advertising injury" to include

> injury . . . arising out of one or more of the following offenses:
>                          * * *
> **d.** oral, written or electronic publication of material that slanders or
> libels a person or organization or disparages a person's or
> organization's goods, products or services;

Id.  The policies exclude liability for breach of contract and infringement of intellectual property

rights, as follows:

> **2.       Exclusions**
>
> This insurance does not apply to:
>                          * * *
> **f.       Breach Of Contract**
>           "Personal and advertising injury" arising out of a
>           breach of contract, except an implied contract to use
>           another's "advertising idea" in your "advertisement"
>           or on "your web site";
>                          * * *
> **I.       Infringement Of Intellectual Property Rights**
>           "Personal and advertising injury" arising out of any
>           violation of any intellectual property rights such as
>           copyright, patent, trademark, trade name, trade secret,
>           service mark or other designation of origin or
>           authenticity.  However, this exclusion does not apply
>           to infringement, in your "advertisement" or on "your
>           web site", of:
>           **(1)**     copyright;
>           **(2)**     slogan, unless the slogan is also a
>                       trademark, trade name, service mark or
>                       other designation of origin or
>                       authenticity; or
>           **(3)**     title of any literary or artistic work.

Id.

---

[5]        In the primary policies, the insuring agreement language for "Coverage B Personal
and Advertising Injury Liability" is substantially the same.

Hartford's umbrella policies incorporate the definition of "personal and advertising injury" contained in the primary policies, and provide as follows:

> **A.      Umbrella Liability Insurance**
>
> We will pay those sums that the "insured" becomes legally obligated to pay as "damages" in excess of the "underlying insurance," or of the "self-insured retention" when no "underlying insurance" applies, because of "bodily injury," "property damage," or "personal and advertising injury" to which this insurance applies caused by an "occurrence".
>
> **B.      Exclusions**
>
> This policy does not apply to:
>
> * * *
>
> 4.       Personal And Advertising Injury
> This policy does not apply to "personal and advertising injury".
>
> * * *
>
> **EXCEPTION**
> This exclusion does not apply if "underlying insurance" is applicable to "personal and advertising injury" and to claims arising out of that "personal and advertising injury".

Doc. #55, Exs. P, Q, R, S.

Effective December 31, 2005 through December 31, 2006, Executive Risk Indemnity, Inc. ("Chubb") issued a Directors and Officers ("D&O") liability insurance policy to Vita Craft with a limit of $2,000,000 inclusive of defense costs (the "Chubb Policy"). Doc. #52, Ex. C. The Chubb Policy provided coverage for individual officers of Vita Craft but did not provide entity coverage for Vita Craft.

Effective December 31, 2007 to December 31, 2008, Travelers Indemnity Company of Connecticut ("Travelers") issued a general liability policy to Vita Craft as named insured. Doc. #52, Ex. F.

### III.    Vita Craft's Tenders and Hartford's Responses

On August 7, 2008, Vita Craft and Imura tendered the underlying amended complaint to

Hartford and demanded that Hartford defend and indemnify them in the TSI lawsuit.  On August 20,

2008, Hartford claim consultant Julie Dengler sent an email to Vita Craft attorney Kimberly Winter

stating as follows:

> A cursory review indicates the allegations do not meet the definition of a "bodily
> injury" or "property damage" arising from an "occurrence."  The allegations do not
> appear to meet the definition of a "personal and advertising injury" arising out of any
> of the enumerated offenses. . . .  We will prepare a more detailed analysis and advise
> you of our position.

Doc. #54-2, Ex. L. ("Dengler email").  Dengler also stated that exclusions for patent infringement,

trademark and other intellectual property violations might apply.

On August 21, 2008, Winter asked Dengler to review the unfair competition count – in case

she had overlooked it – and pointed out that it

> incorporates, among other things, paragraphs 21 and 22 of the complaint, which
> allege interference with business relationships and disparagement which falls within
> the personal and advertising injury provision of the policies.

Doc. #54-2, Ex. L ("Winter email").  On August 22, 2008, Hartford stated that it would take a look

at the unfair competition allegations.

On September 23 and again on September 26, 2008, Vita Craft emailed Hartford, asking when

it could expect Hartford's coverage opinion.  On October 10, 2008,  Winter wrote Hartford to again

request a coverage opinion.

On October 17, 2008, Hartford apologized for the delay and stated that Vita Craft would

receive its coverage opinion no later than October 21, 2008.  On October 30, Vita Craft requested a

coverage opinion.

On November 11, 2008, Hartford denied coverage under all of its policies.  Among other things, Hartford stated that the policies provided no coverage for personal and advertising injury because the underlying complaint "allege[d] no Claims that fall under Offenses a. through h. that are enumerated in the 'personal and advertising injury' definition."  Doc. #54-2, Ex. L at 12.

On February 16, 2010, Vita Craft objected to the denial of coverage and asserted that Hartford had overlooked the provision for coverage of "personal and advertising injury" including "[o]ral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services."  Doc. #54-2, Ex. L at 38-39. Vita Craft asserted that the underlying complaint alleged that Imura and Vita Craft had "engaged in and orchestrated a scheme to damage and injure TSI by spreading false rumors," and that these allegations fell within the policy definitions of "personal and advertising injury."

On July 19, 2010, Vita Craft sent a letter which restated its demand that Hartford defend and indemnify.[6]  On September 24, 2010, Hartford sent Vita Craft a letter stating that it would defend

---

[6]      The letter stated that on December 18, 2009, defendants had deposed Amil Ablah, TSI vice president and secretary, and that his deposition testimony supported coverage. Specifically, Vita Craft stated as follows:

As discussed in our February 16, 2010 correspondence, paragraph 22 of the Complaint alleges that Mr. Imura and Vita Craft "engaged in and orchestrated a scheme to damage and injure [TSI] by spreading false rumors. . . ."

Brian Fields, [Mr. Imura and Vita Craft's joint defense counsel], deposed Thermal Solutions' co-founder and Vice President, Amil Ablah regarding his allegations that Mr. Imura and Vita Craft spread false information about [TSI] and [TSI's] products. When asked if [TSI] has been damaged by Mr. Imura's statements, Mr. Ablah stated that [TSI] has been damaged by Mr. Imura's statements [and] that [TSI's] patents have been made useless because of Mr. Imura and Vita Craft's alleged lies.  Amil Ablah Depo. 57:20, 68:2-5, 113:17-21.  Mr. Ablah also said Mr. Imura was "dishonest" in that Mr. Imura allegedly failed to provide [customers] with "truthful
(continued...)

-10-

[6](...continued)

statements" about [TSI's] products.   Amil Ablah Depo. 67:18-20; 113:17-21.
Indeed, in its summary judgment papers, [TSI] claims that Mr. Imura and Vita
Craft's "improper conduct" has "resulted in plaintiff's inability to find a new
licensee, despite a diligent search, for plaintiff's intellectual property portfolio for
the manufacture and sale of cookware products."   These allegations fall squarely
within the "personal injury" offense of "oral, written publication or electronic
publication of material that slanders or libels a person or organization or disparages
a person's or organization's goods, products or services . . ." covered by the policy.

Doc. #56, Ex. H. In addition to the Ablah deposition, the letter referred to TSI's summary judgment papers. In its response to a motion for summary judgment, TSI alleged that "[i]n a series of email messages on September 25, 2005, Imura wrote to BH Lee, Mr. Martin, and several of his other Vita Craft employees: 'Don't trust CookTek!!!! They are fraud.'" Doc. #52, Ex. H at ¶ 40. Hartford did not have information about Imura's emails until Vita Craft produced TSI's response to the motion on March 8, 2012 – the day before Judge Lungstrum entered summary judgment in favor of Vita Craft and Imura as to all remaining claims by TSI. See Doc. #57, Ex. 1.

On July 30, 2010, Hartford obtained a transcript of Ablah's deposition testimony. In relevant part, Ablah testified as follows: Imura told TSI that he was going to give Regal Ware (a cookware company) a sub-license to manufacture and sell patented cookware and asked TSI to give him a list of TSI patents. Imura told Regal Ware that he owned TSI and its patents. Imura told Ablah that he owned a portion of Regal Ware, even though he did not. Doc. #55-4 at 16. Imura took a patented product to Regal Ware, and Regal Ware said that it wanted a certain model of it. Imura had some models built, but they did not include a display which TSI wanted. Imura told TSI that the models were built that way at Regal Ware's request. A Regal Ware representative later told Ablah that Regal Ware had never asked Imura to build the product without a display. Doc. #55-4 at 16-19. Ablah essentially stated that he could not put a figure on how much damage Imura caused to TSI, but that "it has been a huge disaster because of [Imura's] lies." Doc. #55-4 at 19. As a result of lies that Imura told all of his contacts, the patents for residential products were rendered useless. Id. at 16. Ablah stated that Imura had gone to different companies and was "not telling them truthful statements from what we've got." Ablah did not specify what the phrase "what we've got" meant.

Although Ablah's testimony is not always completely clear, Hartford interpreted it as potentially triggering coverage. Kirsten Burns, in-house counsel for Hartford, testified that Hartford agreed to defend because of the "remote possibility" that based on Ablah's testimony, a court would find coverage. Hartford decided that the prudent course of action would be to defend the case and file a declaratory judgment action to resolve the issue of coverage and its duty to defend. Doc. #52-12 at 11-12. Burns thought that under Coverage B, subsection d, the policies afforded "potential" coverage because Ablah was articulating slanderous statements made against TSI. Doc. #52-12 at 13.

Because the Court finds that Hartford owed Vita Craft a duty to defend based on the underlying complaint, it does not attempt to parse the parties' competing and confusing

(continued...)

Vita Craft and Imura under a reservation of rights, but only from July 30, 2010 – the date that Hartford received the deposition of Amil Ablah, TSI Vice President.  Doc. 54-2 at 15.  Hartford stated that the amended complaint did not allege "personal and advertising injury"[7] and that the common law unfair competition count (Count VI) was based on customer confusion as to TSI goods and services, not false statements about TSI customers.  Id.

On November 5, 2010, Vita Craft accepted Hartford's offer of defense but objected to the reservation of rights and Hartfords's attempt to impose hourly rate limitations on defense counsel. Vita Craft also asserted that Hartford had no valid basis for limiting its defense to the period after July 30, 2010.

## IV.    Defense Costs Incurred by Vita Craft and Amounts Previously Paid by Insurers

On or about August 12, 2008, Chubb accepted defense of the TSI Lawsuit for Imura only. At all relevant times, Lathrop & Gage LLP provided joint representation to Imura and Vita Craft in the TSI lawsuit.  Although it only owed defense costs to Imura, Chubb ultimately agreed to pay 80 per cent of the joint defense costs.  Chubb also agreed to pay the rates which Lathrop & Gage

---

[6](...continued)
interpretations of Ablah's deposition testimony.

[7]       Specifically, the letter stated in relevant part as follows:

[The amended complaint] does not allege "oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services."  Although the TSI Complaint alleges that . . . Vita Craft spread "false rumors regarding one of TSI's licensees," this allegation does not constitute libel, slander or disparagement of goods, products or services.  Libel, slander and disparagement each require more than a mere false statement.

Doc. 54-2 at 35.

charged for Vita Craft's defense.  In May of 2010, however, Chubb's liability was exhausted through payment of defense costs.

Travelers agreed to defend Vita Craft and Imura from July 30, 2010 (the date when it received Ablah's deposition) but only at rates of up to $260 per hour for partners, $190 per hour for associates and $75 per hour for paralegals.  Hartford and Travelers agreed to equally share defense costs at reduced rates from July 30, 2010.[8]  Vita Craft objected to Hartford's purported right to impose rates other than those which Lathrop & Gage actually billed to defend the TSI lawsuit.

Vita Craft asserts that through January 31, 2012, the total amount incurred in joint defense of Vita Craft and Imura is $3,797,638.55.  Lathrop & Gage charged Vita Craft the following rates for work performed by primary timekeepers, partners Brian Fields and Brad Leitch, associate Jason Parks and paralegal Keenan Barker:[9]

|        | 2008  | 2009  | 2010  | 2011  | 2012  |
|--------|-------|-------|-------|-------|-------|
| Leitch | $315  | $335  | $350  | $350  | $360  |
| Fields | $285  | $295  | $310  | $310  | $330  |
| Parks  | $210  | $230  | $250  | $250  | $260  |
| Barker | $160  | $175  | $180  | $180  | $180  |

See Doc. #54.

On November 23, 2010, Hartford filed this action, seeking a declaration that it did not owe

---

[8]     For certain invoices beginning around May of 2011, Hartford paid defense fees based on the rates charged by Vita Craft counsel, Lathrop & Gage.

[9]     Leitch has been practicing law since 1991, Fields since 1996 and Parks since 2004. Barker has been a paralegal since 1987.

Vita Craft or Imura a duty to defend or indemnify the claims in the TSI action.[10]  Vita Craft and

Hartford both seek summary judgment on this issue.  Vita Craft filed counterclaims asserting that

(1) Hartford breached a contractual duty to defend, (2) Hartford acted in bad faith when it initially

denied coverage and when it refused to pay the rates charged by defense counsel after it agreed to

defend and (3) Vita Craft is entitled to attorneys' fees under K.S.A. § 40-256 for the cost of

prosecuting this action.  Both parties seek summary judgment on these issues as well.

## ANALYSIS

A federal court sitting in diversity applies the choice of law rules of the state in which it sits.

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941).  Here, the parties agree that Kansas

law applies to interpretation and application of the policies, and the Court applies Kansas law.

Pretrial Order (Doc. #45) at §3.d; see Ace Prop. & Cas. Ins. Co. v. Superior Boiler Works, Inc., 504

F. Supp.2d 1154, 1158 (D. Kan. 2007) (applying Kansas law to insurance contracts which parties

entered into in Kansas).

## I.      Duty To Defend

### A.      Standards

Under Kansas law, an insurer has a duty to defend if there is any potential for liability under

a policy of insurance.  City of Salina, Kan. v. Md. Cas. Co., 856 F. Supp. 1467, 1480 (D. Kan. 1994);

Spruill Motors, Inc. v. Universal Underwriters Ins. Co., 212 Kan. 681, 686, 512 P.2d 403, 407 (1973).

An insurer's duty to defend thus is broader than its duty to indemnify.  Am. Motorists Ins. Co. v. Gen.

Host Corp., 946 F.2d 1489, 1490 (10th Cir. 1991) (insurer may incur duty to defend even though it

ultimately may have no obligation to indemnify liability found against insured).  The insurer must

---

[10]      On May 20, 2011, Hartford voluntarily dismissed Imura from this action.

undertake a good-faith analysis of all information known to it or reasonably ascertainable by inquiry and investigation in order to determine the possibility of coverage.  See id. (so long as insured can show nonfrivolous possibility that claim may fall within coverage of insurance contract, insurer has duty to defend); see Park Univ. Enter. v. Am Cas. Co., 314 F. Supp.2d 1094, 1101 (D. Kan. 2004) (under Kansas law, insurer has duty to defend whenever there is possibility of coverage, even if remote).  An insurer must look beyond the effect of the pleadings and consider any facts brought to its attention or which it could reasonably discover; if such facts give rise to a "potential of liability" under its policy, the insurer bears a duty to defend.  Spruill Motors, 212 Kan. at 686, 512 P.2d at 407; see Bankwest v. Fid. & Deposit Co., 63 F.3d 974, 978 (10th Cir. 1995) (under Kansas law, insurer's duty to defend determined by allegations of underlying complaint and facts discoverable to insurer).  Under this approach, the insurer's duty to defend hinges on the potential for coverage, but the universe of information from which that potential must be ascertained is much greater than the universe used in an approach limited to the "eight corners"of a pleading and the applicable insurance policy.  On the other hand, where a petition alleges an act which the policy clearly does not cover, there is no potential of liability.  See Freightquote.com, Inc. v. Hartford Cas., Ins. Co., 316 F. Supp.2d 937, 941 (D. Kan. 2003) (quoting Spivey v. Safeco Ins. Co., 254 Kan. 237, 245-46, 865 P.2d 182, 188 (Kan. 1993)), aff'd, 397 F.3d 888 (10th Cir. 2005).  An insurer has no duty to defend an action brought "wholly outside any coverage obligations assumed in the policy or when the insurer would have no liability if plaintiff secured a judgment against the insured."  Spruill Motors, 212 Kan. at 685, 512 P.2d at 406.

The interpretation of an insurance policy, like other contracts, is a question of law.  See AMCO Ins. Co. v. Beck, 261 Kan. 266, 269, 929 P.2d 162, 165 (1996).  Courts give the terms in an

insurance policy their plain and ordinary meaning unless the parties have expressed a contrary intent. See Pink Cadillac Bar & Grill, Inc. v. U.S. Fid. & Guar. Co., 22 Kan. App.2d 944, 948, 925 P.2d 452, 456 (1996). The test to determine whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean. Id. To be ambiguous, a contract must contain provisions or language of doubtful or conflicting meaning, as gleaned from a natural and reasonable interpretation of its language. Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co., 248 Kan. 657, 659, 810 P.2d 283, 285 (1991). Where the terms of a policy of insurance are ambiguous or uncertain, conflicting or susceptible of more than one construction, the construction most favorable to the insured must prevail. Id. If the policy is not ambiguous, the Court must enforce it according to its terms. See Am. Media, Inc. v. Home Indem. Co., 232 Kan. 737, 740, 658 P.2d 1015, 1019 (1983). The insured has the burden to prove coverage under the policy. See Shelter Mut. Ins. Co. v. Williams, 248 Kan. 17, 29-30, 804 P.2d 1374, 1383 (1991). The insurance company has the duty to show that a specific provision of the policy excludes coverage. Id.

B.   Policy Language Interpretation

The parties dispute whether the allegations against Vita Craft in the underlying complaint established the potential for coverage and thus triggered Hartford's duty to defend. See Spruill Motors, 212 Kan. at 686, 512 P.2d at 407. In that regard, the parties focus on Count VI of the underlying complaint, titled "Common Law Unfair Competition." Count VI alleged that defendants' conduct "constitute[d] unfair competition in violation of the common law of the State of Kansas" and caused TSI irreparable injury and damage in excess of $75,000. See Vita Craft Ex. D at ¶ 61. Count VI incorporated all of the complaint's factual allegations, including paragraph 22, which

-16-

alleged that Vita Craft through Imura "engaged in and orchestrated a scheme to damage and injure TSI by spreading false rumors regarding one of TSI's licensees." See id. at ¶22.

Vita Craft argues that these allegations created the potential for coverage for "personal and advertising injury," including "injury . . . arising out of . . . oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services." Vita Craft contends that TSI sought and could potentially recover damages which it suffered as a result of Imura's defamatory statements and/or disparagement (i.e. false rumors) about TSI's licensee, CookTek. Hartford contends that it had no duty to defend because the underlying complaint and extrinsic evidence did not set out an actionable claim for personal and advertising injury.[11] In the alternative, Hartford argues that the policy exclusions for intellectual property claims and contract claims precluded coverage.

Although the Court does not specifically address each of the parties' arguments and authorities, it has considered all of them in determining the fundamental issue: whether the allegations of the underlying complaint established a possibility that Vita Craft could be legally obligated to pay damages for injury arising out of oral, written or electronic publication of material that slandered or libeled a person or organization or disparaged the person's or organization's goods, products or services. See Am. Fid. Ins. Co. v. Emp'r Mut. Cas. Co., 3 Kan. App.2d 245, 251, 593 P.2d 14, 19-20.

---

[11]     More specifically, Hartford contends that (1) Kansas law does not recognize an "unfair competition" claim based on a theory of defamation or disparagement and that (2) the underlying lawsuit does not assert an actionable claim for defamation or disparagement.

Hartford argues that the policies cover only the "offenses" of the common law torts of defamation and disparagement, that TSI did not allege each element of a claim for defamation or disparagement, and that even if TSI did allege defamation, it was only as to a TSI licensee. The Court notes, however, that TSI claims that it suffered injury because defendants defamed its licensee.

1.      Potential Coverage For Personal And Advertising Injury

Hartford asserts that the policy defines "personal and advertising injury" in terms of enumerated "offenses," <u>i.e.</u> slander, libel and disparagement, which Kansas law recognizes as specifically defined torts, and that the policy only covers those specific torts in fully embodied and alleged form.  <u>See Lapeka, Inc. v. Sec. Nat'l Ins. Co, Inc.</u>, 814 F. Supp. 1540, 1549 (D. Kan. 1993) (policy unambiguously limited coverage to listed torts).  Vita Craft concedes that TSI did not explicitly plead slander, libel or disparagement, but correctly points out that under Kansas law, the label which the pleader places on the conduct alleged does not determine the issue of coverage or the duty to defend.  <u>See United Wats, Inc., v. Cincinnati Ins. Co.</u>, 971 F. Supp. 1375, 1384 (D. Kan. 1997) (insurer obligated to defend claims of tortious interference even though complaint did not specifically allege such claims); <u>see also McCormack Baron Mgmt. Servs., Inc., v. Am Guarantee & Liability Ins. Co.</u>, 989 S.W.2d 168, 171 (Mo. 1999) (policy which covers "offense" of oral publication that disparages person's services not limited to claims for "cause of action" for disparagement); <u>cf. BASF AG v. Great Am. Asur. Co.</u>, 522 F.3d 813, 819-20 (7th Cir. 2008) (although under Illinois law, insured covered against particular conduct regardless of label placed on conduct by pleader; complaint failed to sketch claim for offense of slander, libel or disparagement).

In <u>Bankwest v. Fidelity & Deposit Co. of Maryland</u>, 63 F.3d 974, 980 (10th Cir. 1995), the Tenth Circuit Court of Appeals analyzed the duty to defend under a policy which provided coverage for injury arising out of "the publication or utterance of a libel or slander or of other defamatory or disparaging material."  Bankwest argued that this provision was broad enough to include a lawsuit which set out claims for intentional interference with contract and business relations.  The underlying petition alleged that (1) Bankwest had sent estoppel letters which falsely stated that various banks

were estopped from advancing funds to the underlying plaintiff and (2) those false statements caused plaintiff to suffer pecuniary loss.  As in this case, the insurer argued that it had no duty to defend because the underlying lawsuit did not specifically allege a claim for libel, slander or disparagement. The Tenth Circuit found that the policy could reasonably be read to encompass claims other than libel or slander that involved the publication of "defamatory or disparaging material" and that the policy covered more than just libel and slander claims.  Id. at 980 (citing Boston Symphony Orchestra, Inc. v. Commercial Union Ins. Co., 406 Mass. 7, 12, 545 N.E.2d 1156, 1159 (1989)).

Hartford correctly notes that the policy language in Bankwest differs from that in the instant case.  There, the policy contained a "catch-all" phrase for damages arising from publication of "other defamatory or disparaging material"; here, the policies cover "injury" arising out of certain "offenses," including the publication of material that slanders or libels another or disparages its goods, products or services.  Consequently, Hartford argues that its policy language only covers discrete free-standing claims for libel, slander or disparagement.  See Doc. #57 at 22.  Hartford's argument, however, overlooks the fact that its policies define "personal and advertising injury" to include injury *arising out of* "oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or service."  In dicta since Bankwest, the Tenth Circuit has stated that the exact policy language at issue here is broad enough to include a tortious interference claim.  See Freightquote.com, Inc. v. Hartford Cas. Ins. Co., 397 F.3d 888, 896 (10th Cir. 2005).

Hartford's policy language clearly obligated it to defend where the underlying plaintiff alleged that it suffered damages "arising out of" the insured's publication of material which slandered or libeled a person or organization or which disparaged the good, products or services of a person or

organization.  Garrison v. State Farm Mut. Auto. Ins. Co., 20 Kan. App.2d 918, 923; 895 P.2d 226, 230 (1995) (in coverage provision, broadly construing term "arising out of" in favor of insured).

Hartford argues that the policy does not provide coverage because under Kansas law, the common law tort of unfair competition cannot be based on a theory of slander, libel or disparagement, but rather only includes traditional intellectual property infringement, as well as misappropriation of trade secrets and other confidential information.  Doc. #57 at 20; see Accessible Tech., Inc., v. Paxton Auto. Corp., No. 01-2407-CM, 2002 WL 31256227, at *2 (D. Kan. Aug. 28, 2002) (Kansas unfair competition law generally provides cause of action for misuse of trademark or other intellectual property); Wichita Clinic, P.A. v. Columbia/HCA Healthcare Corp., 45 F. Supp.2d 1164, 1199 (D. Kan. 1999) (Kansas cases discussing tort of unfair competition have involved claims of misuse of intellectual property).  As noted, however, the label which the underlying plaintiff attaches does not matter.  Here, TSI alleged that it suffered damages arising out of the publication of material which slandered or libeled a person or organization or which disparaged the good, products or services of a person or organization.  The policy obligated Hartford to defend such allegations.

As noted, Hartford argues that it had no duty to defend because the underlying lawsuit did not assert a viable claim against Vita Craft for defamation or disparagement.  Under Kansas law, the elements of a cause of action for defamation, including slander and libel, include (1) false and defamatory words; (2) communicated to a third person; (3) which result in harm to the reputation of the person defamed.  Hall v. Kan. Farm Bureau, 274 Kan. 263, 276, 50 P.3d 495, 504 (2002). Hartford contends that the underlying lawsuit did not allege false and defamatory words or harm to TSI's reputation.  Specifically, Hartford argues that the "bare bone allegation" that Vita Craft and Imura were "spreading false rumors" about a TSI licensee is too vague and conclusory to constitute

-20-

a claim for libel, slander or disparagement.  Hartford also asserts that allegations of defamatory statements about a third party (CookTek), rather than TSI, do not constitute allegations that TSI suffered injury due to libel, slander or disparagement.  See BASF, 522 F.3d at 820 (underlying complaint did not allege defamation offense because underlying plaintiffs had no standing to assert defamation claim based on statements about non-party scientist whose study was allegedly denigrated); Great Am. Ins. Co. v. Riso, Inc., 479 F.3d at 162 (defamation offense not triggered where statements directed toward *non-party*).

Although sparse, the complaint alleges that Vita Craft and Imura "engaged in and orchestrated a scheme to damage and injure TSI by spreading false rumors regarding one of TSI's licensees." Further, in its response to a motion for summary judgment, TSI alleged that "[i]n a series of email messages on September 25, 2005, Imura wrote to BH Lee, Mr. Martin, and several of his other Vita Craft employees: 'Don't trust CookTek!!!! They are fraud." Though the complaint and response to summary judgment both asserted false and defamatory statements about CookTek, they also asserted that TSI suffered damages on that account because CookTek is a TSI licensee.

The policies did not limit libel or slander coverage to claims by persons claiming to have been directly slandered or libeled, as opposed to persons claiming to have suffered by virtue of slander or libel of their licensees.  See Ex. A (coverage for publication of material that slanders or libels *a* person or organization or disparages *a* person's or organization's goods, products or services). Construed in favor of the insured, as Kansas law requires, the policy potentially covered injury to the underlying plaintiff for defamation or disparagement of a third party.  Further, the lawsuit and reasonably discoverable facts alleged that TSI suffered harm from Vita Craft's defamation of a TSI

licensee.[12]

### 2.    Policy Exclusions

Hartford argues that even if Vita Craft established a potential for coverage for defamation, the policy excluded coverage for personal and advertising injury arising out of infringement of intellectual property rights or breach of contract.  The insurer carries the burden to prove that an exclusion applies.  Upland Mut. Ins. Co. v. Noel, 214 Kan. 145, 150, 519 P.2d 737, 741 (Kan. 1974).  Courts construe coverage provisions broadly and interpret exclusionary clauses narrowly against the drafter, in favor of coverage.  See, e.g., Lee Builders, Inc. v. Farm Bureau Mut. Ins. Co., 281 Kan. 844, 858-59, 137 P.3d 486, 495 (Kan. 2006); Dillon Co., v. Royal Indem. Co., 369 F. Supp.2d 1277, 1284 (D. Kan. 2005) (ambiguities construed favorably to insured).

### a)    Intellectual Property Exclusion

---

[12]    Hartford also argues that it had no duty to defend because Kansas does not recognize the tort of product disparagement, and that even if it did, Vita Craft has not shown that the underlying lawsuit set out a claim for disparagement.

Kansas courts have not recognized the tort of product disparagement. St. Catherine Hosp. v. Rodriguez, 25 Kan. App.2d 763, 768, 971 P.2d 754, 757 (1998).  The tort of disparagement, where recognized, requires (1) a statement was made criticizing the quality of the plaintiff's goods or services; (2) in order to influence or tend to influence the public not to buy; and (3) the statement compared the defendant's goods, products or services to the plaintiff's goods, products or services. Lexmark Int'l, Inc. v. Transp. Ins. Co., 327 Ill. App.3d 128, 140, 761 N.E.2d 1214, 1225 (1st Dist. 2001); Lamar Adver. Co. v. Cont'l Cas. Co., 396 F.3d 654, 664 (5th Cir. 2005).  The statement must have been about the plaintiff's goods, products or services, not some other party's goods products or services.  As discussed above, Paragraph 22 of the underlying complaint does not allege any false statements criticizing TSI's products or even CookTek's products, but only "false rumors about one of TSI's licensees."  Further, Imura's emails ("Don't trust CookTek!!!!  They are fraud;" and "CookTek is very foolish and bad company") do not criticize TSI or CookTek goods, products or services.  The Court agrees that Vita Craft has not pointed to evidence that TSI's claims are based on "material that . . . disparages a person's or organization's goods, products or services" so as to come within coverage.  Neither paragraph 22 of the underlying complaint nor Imura's emails suggest that (1) the "false rumors" were criticism of TSI goods or services; (2) the "false rumors" were made to influence or tend to influence the public not to buy TSI goods or services; or (3) the "false rumors" compared Vita Craft goods, products or services to TSI goods, products or services.  Vita Craft has not shown that TSI ever made any claim for product disparagement.

Each policy excluded liability for personal and advertising injury "arising out of" any violation of intellectual property rights such as copyright, patent, trademark, trade name, trade secret, service mark or other designation of origin or authenticity. Hartford argues that all claims in the underlying lawsuit arose out of violation of intellectual property rights. Citing Black's Law Dictionary, Hartford notes that the term "intellectual property" is a broad concept which includes "rights against unfair competition." Doc. #55 at 53. Hartford also relies on <u>Garrison v. State Farm Mutual Auto. Insurance Co.</u>, 20 Kan. App.2d 918, 923; 895 P.2d 226, 230 (1995), which defined "arising out of" as meaning "originating from," "having its origin in," "growing out of" or "flowing from." In <u>Garrison</u>, however, the Court was determining coverage in deciding whether a bodily injury was "arising out of" the use of a motor vehicle.[13] This broad definition *in determining coverage* does not illuminate how the term should be construed in an exclusion clause.

Hartford notes that of the six counts directed against Vita Craft, all but one was for breach of contract, patent infringement or misappropriation of trade secrets. It argues that the remaining claim – for common law unfair competition – fell within the intellectual property exclusion because in Kansas unfair competition is limited to traditional intellectual property infringement, <u>i.e.</u> patent, copyright, trade mark, misuse of trade secrets or misuse of confidential business information. <u>See</u> <u>Marvin J. Perry, Inc. v. Hartford Cas. Ins. Co.</u>, 412 Fed. Appx. 607, 611 (4th Cir. 2011) (mere

---

[13]    Specifically, the Court in <u>Garrison</u> addressed the following question:

Does the accidental discharge of a shotgun, the cause of which is unknown, occurring while a gun is being unloaded from a car during a hunting trip, *arise out of* or result from the ownership, use, and maintenance of an automobile so that the resulting injuries are covered by an automobile insurance policy?

<u>Garrison</u>, 20 Kan. App.2d at 921, 895 P.2d at 229-30 (emphasis added).

possibility that unfair competition can exist independent of trademark violation does not mean that underlying complaint raised independent claim).  Vita Craft responds that the underlying complaint alleged that Vita Craft spread false rumors about a TSI licensee, and that these allegations are not tied to intellectual property rights.  The Court agrees.  The underlying complaint alleged that Vita Craft had disparaged TSI licensee CookTek.  Hartford has not met its burden to demonstrate that the intellectual property exclusion barred coverage or a duty to defend.

b.    <u>Breach Of Contract Exclusion</u>

In the alternative, Hartford also argues that the policy exclusion for breach of contract excluded coverage for the underlying lawsuit.  Hartford again argues that under Kansas law, the Court must broadly interpret the phrase "arising out of," but the Court has rejected that argument in the context of policy exclusions.  Hartford also argues that all claims in the underlying suit arose out of Vita Craft's alleged breaches of contract with TSI.  <u>See, e.g.</u>, <u>Callas Enters. v. Travelers Indem. Co. of Am.</u>, 193 F.3d 952, 955 (8th Cir. 1999) (where complaint alleged exclusive agreement, breach of contract exclusion applied broadly to all claims, including those based on state law deceptive trade practices act, Lanham Act and defamation); <u>Capitol Specialty Ins. v. Indus. Elecs., LLC</u>, 407 Fed. Appx. 47, 51 (6th Cir. 2011) (broadly construing "arising out of" language in breach of contract exclusion); <u>Yates Carpet, Inc. v. Travelers Lloyds Ins. Co.</u>, No. 07- 06-0478-CV, 2008 WL 2467881, at *2 (Tex. App. Jun. 19, 2008) (claims for trademark infringement, unfair competition, deceptive and unfair trade practices, fraud, breach of contract and unjust enrichment excluded by breach of contract exclusion).  Vita Craft counters that TSI's allegations about Vita Craft spreading false rumors would exist regardless of the license agreements between Vita Craft, Imura and TSI.  Further, the unfair competition and false rumor allegations did not mention the license agreements between

-24-

TSI and Vita Craft.  Narrowly construing the exclusion, as it must, the Court finds that the disparagement allegations did not arise out of breach of contract.  The contract exclusion therefore did not bar coverage or a duty to defend.

      C.    <u>Summary</u>

In summary, the Court finds that Vita Craft is entitled to summary judgment on its claim that Hartford owed a duty to defend Vita Craft in the underlying lawsuit.  The parties' motions for summary judgment on the issue of indemnification are moot because TSI did not recover any damages in the underlying lawsuit.

**II.**    **Vita Craft's Claims For Breach of Contract**

Vita Craft asserts that it is entitled to summary judgment on its claim that Hartford breached its contractual duty by (1) refusing to pay defense costs from July 11, 2008 (the date of the amended complaint) to July 30, 2010 and (2) refusing to pay the hourly rates which Vita Craft counsel billed throughout the underlying lawsuit.  As set forth above, Hartford had a duty to defend Vita Craft as of July 11, 2008 (the date of the amended complaint in the TSI lawsuit).  Hartford breached that duty by its belated decision to defend Vita Craft under a reservation of rights beginning July 30, 2010.  Vita Craft is therefore entitled to recover damages for Hartford's breach, <u>i.e.</u> its refusal to pay the reasonable attorneys' fees which Vita Craft incurred in defending the TSI lawsuit.

Vita Craft contends that Hartford must pay the full amount of defense fees which it incurred: $709,340.07 for defense costs through July 20, 2010, $235,272.44 for underpayment of costs incurred from July 21, 2010 through January 31, 2012, and an unspecified amount for additional costs incurred since January 31, 2012.

An appropriate attorneys' fee for defending an insured in underlying litigation is based on the

standard of reasonableness which exists in the community. Spruill Motors, 212 Kan. at 688-89, 512 P.2d at 409. Lathrop & Gage billed its work in the underlying case at hourly fees of $285 to $360 for partners, $210 to $260 for experienced associates and $160-180 for an experienced paralegal. Vita Craft points out that it hired Lathrop & Gage with the understanding that it would be responsible to pay the specified hourly rates unless and until any insurer accepted a defense obligation. Further, Chubb agreed to pay the same rates. Vita Craft argues that as a matter of law, the rates charged by Lathrop & Gage in this matter are reasonable and must be reimbursed by Hartford. See, e.g., Taco Bell Corp. v. Cont'l Cas. Co., 388 F.3d 1069, 1077 (7th Cir. 2004) (defense fees incurred and paid in ordinary course of business while insurer contested duty to defend reasonable). Vita Craft also notes that Hartford recently paid certain Lathrop & Gage invoices in this matter at the billed rates, and asserts that Hartford's payment of those invoices acknowledges the reasonableness of the rates charged. Finally, Vita Craft points out that this Court ordered a Hartford entity to pay its insured's defense counsel's rates of $205 to $250 per hour for work done beginning in 1999 for a construction litigation matter in this jurisdiction. See Fid. & Deposit Co. of Md. v. Hartford Cas. Ins. Co., 215 F. Supp.2d 1171, 1188-89 (D. Kan. 2002). Vita Craft argues that in this complex litigation , the rates imposed by Hartford for work done in 2008-2012 are well below market. See id.

Hartford complains that Vita Craft relies on Lathrop & Gage charges to establish market rates, and argues that Vita Craft has not presented sufficient evidence to establish the reasonableness of those rates. See Lucero v. City of Ribnidad, 815 F.2d 1384, 1285-86 (10th Cir. 1987) (customary hourly rate not conclusive evidence of market rate). As set out above, however, Vita Craft has produced the following evidence that the rates which it agreed to pay Lathrop & Gage are at or below market rates: Vita Craft agreed to pay the requested rates; Chubb paid the requested rates; Hartford

paid rates slightly below the requested rates for defense of a construction case over a decade ago; and Hartford paid recent invoices at those rates.  Hartford has not produced sufficient countervailing evidence to create a genuine issue of material fact whether the requested fees are unreasonable. Further, the Court takes judicial notice that the requested fees fall within the range of the market rates in the community for attorneys practicing in intellectual property and contract litigation.  See Erickson v. City of Topeka, Kansas, 239 F. Supp.2d 1202, 1210 (D. Kan. 2002) (judicial notice of prevailing rate of fees in community); Guar. Nat'l Ins. Co. v. McGuire, 192 F. Supp.2d 1204, 1210 (D. Kan. 2002) (same); Schmidt v. Cline, 171 F. Supp.2d 1178, 1182 (D. Kan. 2001) (judicial notice of prevailing rate of fees, concluding requested rate reasonable, based upon court's knowledge of rates in market, coupled with plaintiff's proposal that rate was appropriate).  The Court therefore finds that the hourly rates are reasonable as a matter of law.

In the pretrial order, Hartford asserts that Vita Craft invoices include entries that did not involve work in the TSI lawsuit.  First, Hartford contends that Vita Craft is not entitled to reimbursement for billing entries for "the Wichita matter," which relate to a lawsuit which TSI filed against Vita Craft in Sedgwick County, Kansas.  Second, Hartford contends that its duty to defend does not extend to Vita Craft counterclaims against TSI for breach of contract and tortious interference.  Hartford does not mention these issues, however, in its response to Vita Craft's motion for summary judgment.  Accordingly, it has waived any such objections.

Furthermore, TSI filed the Sedgwick County case on November 24, 2010, alleging three claims for breach of contract.  On August 10, 2011, the Sedgwick County District Court granted summary judgment to Vita Craft, finding that TSI's suit in this court barred its claims in Sedgwick County under "compulsory counterclaim rule, res judicata, claim splitting and concurrent jurisdiction

doctrines." <u>See</u> Sedgwick County Journal Entry, at 20 ¶ 1, Exhibit V.  Because TSI's claims in the Wichita matter should have been brought in the TSI Lawsuit and they contain the same operative facts, Hartford had a duty to defend them.[14]  <u>See</u> <u>Apartment Inv. & Mgmt Co. (AIMCO) v. Nutmeg Ins. Co.</u>, 593 F.3d 1188, 1193 (10th Cir. 2010) (insurer has duty to defend its insured based on allegations contained in several separate but factually related complaints); <u>see also</u> <u>Spivey v. Safeco Ins. Co.</u>, 254 Kan. 237, 247-48, 865 P.2d 182, 188 (1993).

As to whether Hartford must pay attorneys' fees for Vita Craft's pursuit of counterclaims in the TSI suit, Vita Craft points to authority finding that an insurer must pay the insured for defense of its counterclaims when either (1) the counterclaims reach the same or similar issues as the underlying plaintiff's claims so that the claims are intertwined; or (2) the counterclaims are part of the insured's defensive strategy to reduce its liability.  <u>Smart Style Indus., Inc. v. Pa. Gen. Ins. Co.</u>, 930 F. Supp. 159, 164-65 (S.D.N.Y. 1996) (insurer required to pay insured's attorneys' fees incurred prosecuting affirmative claims for declaratory relief where costs for defending and prosecuting inseparable); <u>TIG Ins. Co. v. Nobel Learning Cmtys., Inc.</u>, No. Civ. A. 01-4708, 2002 WL 1340332, at *15 (E.D. Pa. June 18, 2002) (insured's claims critical to and "inextricably intertwined" with defense of copyright infringement claim).  As the Court noted in <u>Great Western Casualty Co. v. Marathon Oil Co.</u>, 315 F. Supp.2d 879, 881, 883 (N.D. Ill. 2003), "the authority appears virtually uniform in holding that there is a class of affirmative claims which, if successful, have the effect of reducing or eliminating the insured's liability and that the costs and fees incurred in prosecuting such 'defensive' claims are encompassed in an insurer's duty to defend. . . . A duty to defend would be nothing but a form of words if it did not encompass all litigation by the insured which could defeat

---

[14]     From the beginning, Vita Craft advised Hartford that the Wichita matter was comprised of claims that should have been brought in the TSI Lawsuit.

its liability, including claims and actions for contribution and indemnification." Hartford has not articulated any opposition to Vita Craft's claim that it must pay attorneys' fees incurred in pursuing its counterclaims, and the Court therefore finds that Vita Craft is entitled those fees.

The Court finds that Hartford must pay the unreimbursed attorneys' fees which Vita Craft incurred in the underlying litigation, including $709,340.07 for costs through July 20, 2010, $235,272.44 for underpayment of costs incurred from July 21, 2010 through January 31, 2012, and additional costs incurred in the underlying litigation since January 31, 2012 (not yet calculated when briefing in this case began).

**III.     Recovery of Attorneys' Fees Under K.S.A. § 40-256**

Both sides also seek summary judgment on Vita Craft's claim for attorneys' fees incurred in *this* action under K.S.A. § 40-256, which provides in pertinent part as follows:

> [I]n all actions hereafter commenced, in which judgment is rendered against any insurance company, . . . if it appears from the evidence that such company . . . has refused without just cause or excuse to pay the full amount of such loss, the court in rendering such judgment shall allow the plaintiff a reasonable sum as an attorney's fee for services in such action . . . .

K.S.A. § 40-256. Under this statute, Vita Craft can recover reasonable attorneys' fees expended in this lawsuit if Hartford failed without just cause or excuse to defend the underlying lawsuit. Container Supply Co. v. Fireman's Fund Ins. Co., 715 F. Supp. 326, 328 (D. Kan. 1989) ("without just cause or excuse" includes refusal to defend that lacks sufficient merit). The insurer's conduct before commencement of the coverage action determines whether a refusal to pay is without just cause or excuse. Id. at 327. The outcome of the underlying litigation is irrelevant for purposes of determining bad faith. Covill v. Phillips, 455 F. Supp. 485, 487 (D. Kan. 1978). The question is whether, at the time that it withheld or declined coverage, the insurer had any reasonable ground for contesting the claim. Id.

Under Kansas law, an insurance company has a duty to investigate a claim to determine whether it has a duty to defend. See Miller v. Westport Ins. Corp., 288 Kan. 27, 33-34, 200 P.3d 419, 423-24 (2009). Here, Burns admitted that she "did nothing" to determine the nature of the false rumors alleged in the underlying litigation. Hartford's coverage opinions did not contain the reasons that it now articulates for denying coverage – including the fact that the "false rumors" were alleged against TSI licensees and not TSI itself. Moreover, Hartford took more than two years to accept its duty to defend. Even then, it refused to defend from the time it had originally received the claim, despite the fact that the allegations in the pleadings were unchanged. See, e.g., Firemen's Ins. Co. of Newark v. Bauer Dental Studio, Inc., 805 F.2d 324, 326 (8th Cir. 1986) (insured entitled to attorney's fees when insurer needlessly prolonged negotiations for two years in hope of avoiding payment altogether).

For reasons set out in the Court's discussion of Hartford's duty to defend, the Court finds that Hartford's reasons for refusing to defend Vita Craft in the underlying lawsuit were without just cause or excuse. The current record, however, does not provide the Court an adequate basis to determine the amount of fees allowable under Section 40-256.

To expedite the resolution of this case and hopefully narrow the issues for trial, the Court directs the parties to consult and attempt to resolve (a) the remaining attorneys' fees which Vita Craft incurred in defending the underlying lawsuit from January 31, 2012, to its conclusion and (b) the reasonable amount of attorneys' fees due under K.S.A. § 40-256. If the parties cannot reach agreement on these, no later than December 7, 2012, they shall file a "statement of consultation" and supportive memorandum. See D. Kan. Rule 54.2.[15]

---

[15]        Due to the scheduled trial on January 7, 2013, expedited briefing is necessary for the
(continued...)

**IT IS THEREFORE ORDERED** that Vita Craft Corporation's Motion For Summary Judgment (Doc. #51) filed May 18, 2012, be and hereby is **SUSTAINED** in part.

**IT IS FURTHER ORDERED** that [Hartford's] Motion For Summary Judgment (Doc. #53), filed May 18, 2012, be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED that the parties shall consult and attempt to resolve all remaining fee issues.  If the parties cannot reach agreement on these issues, they shall file a "statement of consultation" and supportive memorandum no later than December 10, 2012.**

Dated this 3rd day of December, 2012 at Kansas City, Kansas.

s/ Kathryn H. Vratil
KATHRYN H. VRATIL
United States District Judge

---

[15](...continued)
Court to address the parties' issues and hopefully narrow or eliminate the matters for trial.